EDWARD L. MCCURRY, APPELLANT, V.
YOUNG MEN'S CHRISTIAN ASSOCIATION,
DOING BUSINESS AS
MILLER PARK BRANCH, YMCA, APPELLEE.

313 N.W.2d 689

Filed December 28, 1981.   No. 43830.

Jarve L. Garrett for appellant.

Thomas J. Shomaker of Sodoro, Daly & Sodoro for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, MCCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

PER CURIAM.

The plaintiff, Edward L. McCurry, was injured on March 27, 1977, when he fell while playing basketball on an outdoor asphalt playground owned by the defendant, Young Men's Christian Association. He brought this action to recover for the damages he sustained by reason of his injuries in the accident.

The second amended petition alleged the defendant was negligent in failing to properly maintain the surface of the playground and in failing to warn the plaintiff of the dangerous condition of the surface of the playground. The answer alleged the plaintiff was contributorily negligent and had assumed the risk of injury.

At the close of the plaintiff's evidence, the trial court sustained the defendant's motion for a directed verdict and dismissed the plaintiff's petition. The plaintiff has appealed.

The claimed defect in the surface of the playground was a depression in the surface of the asphalt, described by the plaintiff as 2 to 3 feet long, 2 to 3 inches wide, and 1½ to 2 inches deep. There was no evidence as to how long the defect had existed or when the defendant may have known about it.

The playground itself was fenced. There were two gates in the fence, one of which was padlocked. The other gate was open.

The plaintiff was 33 years of age. Although the plaintiff had played on the playground approximately once a week during the summer of 1976, he was not a member of the YMCA and had not obtained any express permission to use the playground.

The day of the accident was a "nice, warm day." After the plaintiff had entered the playground, he took a couple of practice "shots" before the game began. There were five other players participating in the game. According to the plaintiff, he had received the ball, had faked another player out of position, and was going toward the basket when he fell. Upon direct examination the plaintiff testified as follows: "Q. You indicated that you were going towards the basket and you fell; is that correct? A. Yes. Q. Now, after you fell did you determine what you had fell on? A. It was a — Q. Did you determine that, did you determine after you fell what you fell on, yes or no? A. I didn't know what it was that 1 fell on. After I got up I started to pain, I couldn't walk." It is quite clear from the record that the plaintiff did not know what caused him to fall, but noticed the depression after the accident and concluded that it must have been the cause of the accident.

William John Pilcher, a former brother-in-law of the plaintiff, was playing in the game at the time the

plaintiff was injured. According to Pilcher the accident happened when the plaintiff was "going for a layup." Pilcher testified, "He just went up and he just -- he just went, just went down."

The second amended petition alleged that the plaintiff was a "patron and invitee" on the playground at the time of the accident. The evidence is undisputed, however, that the plaintiff was not a member of the YMCA and had not obtained express permission to use the playground. Although the defendant did not prevent the plaintiff and others from using the playground, there is no evidence of an invitation to the public to use the playground.

One who, solely for his own personal pleasure, convenience, or benefit, enters the premises of another with the consent of the latter but without an invitation, express or implied, is a bare licensee. *Kruntorad v. Chicago, R. I. & P. R. Co.*, 111 Neb. 753, 197 N.W. 611 (1924). Under the circumstances in this case, the plaintiff had the status of a licensee and was not an invitee.

The owner or occupant of property owes to a licensee the duty only to refrain from injuring him by willful or wanton negligence or a designed injury, or by failure to warn of a hidden danger or peril known to the owner or occupant but unknown to or unobservable by the licensee in the exercise of ordinary care. *Hackney v. Klintworth*, 182 Neb. 219, 153 N.W.2d 852 (1967); *Presho v. J. M. McDonald Co.*, 181 Neb. 840, 151 N.W.2d 451 (1967).

If we assume for the purpose of discussion that the depression in the surface of the playground was a defect, the evidence is clear that it was open and obvious. It was not a hidden danger or peril, but was something the plaintiff could have readily discovered by the exercise of even slight care. There was no evidence of willful or wanton negligence or a designed injury.

The evidence failed to show a breach of any duty owed to the plaintiff by the defendant for which the

plaintiff could recover for his damages. The order dismissing the petition at the close of the plaintiff's evidence was not erroneous.

The judgment of the District Court is affirmed.

AFFIRMED.

BRODKEY, J., dissenting.

I cannot emphasize too strongly that the issue to be decided by us in the pending appeal to this court is *not* whether the plaintiff is entitled to recover on the merits of his action under the evidence adduced at the trial but, rather, whether the plaintiff was entitled to have his evidence submitted to the jury for its determination on the issues involved in the case. It must be remembered that this case was not submitted to the jury for its determination; but, on the contrary, the trial court sustained the defendant's motion for a directed verdict at the close of the plaintiff's evidence, and dismissed plaintiff's petition. Inasmuch as the majority opinion fails to set out or discuss the well-settled rules of law applicable to motions for directed verdicts and dismissal of actions, I shall now do so, as the correct determination of this appeal depends upon the legal principles involved, following which I will review the pertinent evidence contained in the record which I am convinced clearly required the submission of the case to the jury.

The following principles of law are well established in Nebraska. "A motion for directed verdict or its equivalent must for the purposes of decision thereon be treated as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed. Such party is entitled to have every controverted fact resolved in his favor and to have the benefit of every inference that can reasonably be deduced from the evidence." *Presho v. J. M. McDonald Co.*, 181 Neb. 840, 841, 151 N.W.2d 451, 453 (1967). See, also, *Crawford v. Soennichsen*, 175 Neb. 87, 120 N.W.2d 578 (1963); *Costello v. Simon,*

180 Neb. 35, 141 N.W.2d 412 (1966); *Syas v. Nebraska Methodist Hospital Foundation,* 209 Neb. 201, 307 N.W.2d 112 (1981). "A trial court should direct a verdict as a matter of law only when facts are conceded, undisputed, or such that reasonable minds can draw but one conclusion therefrom." *Krug v. Laughlin,* 208 Neb. 367, 371, 303 N.W.2d 311, 313 (1981). When different minds may reasonably draw different conclusions from the same facts as to whether they establish negligence or contributory negligence, such issues should be submitted to the jury. *Beck v. Trustin,* 177 Neb. 788, 131 N.W.2d 425 (1964); *Buie v. Beamsley,* 171 Neb. 181, 105 N.W.2d 738 (1960). "'In determining the question of whether the evidence is sufficient to submit the issues of negligence and contributory negligence to the jury, a party is entitled to have all conflicts in the evidence resolved in his favor and the benefit of every reasonable inference that may be deduced from the evidence, and if reasonable minds might draw different conclusions from a set of facts thus resolved in favor of a party, the issues of negligence and contributory negligence are for a jury.'" *Moats v. Lienemann,* 188 Neb. 452, 454, 197 N.W.2d 377, 379 (1972).

In determining the duty owed by the defendant in this case to the plaintiff, it is first necessary to determine the status of the plaintiff on the premises in question at the time plaintiff was injured. We have held that the law places those who come upon the premises of another in three classes: Briefly defined, invitees are those who are expressly or impliedly invited, as a customer to a store; licensees are persons whose presence is not invited, but tolerated; trespassers are persons who are neither suffered nor invited to enter. *Haley v. Deer,* 135 Neb. 459, 282 N.W. 389 (1938). In *Haley* we also stated at 463, 282 N.W. at 392: "The duty of the owner toward an invitee is, to exercise reasonable care to keep the premises in a safe condition, but licensees take the

premises as they find them, the only duty of the occupier being to give notice of traps or concealed dangers. Toward trespassers the occupier need only refrain from wilful or wanton injury as modified by the 'attractive nuisance' line of cases." We note, however, that Restatement (Second) of Torts § 332 (1965) divides "invitees" into two subcategories, to wit, business visitors and public invitees. That section defines a "public invitee" as follows: "A public invitee is a person who is invited to enter or remain on land as a member of the public for the purpose for which the land is held open to the public." In its Comment to subsection (2), which sets forth the foregoing definition, the Restatement, at 179, gives the following illustration: "When a landowner tacitly permits the boys of the town to play ball on his vacant lot they are licensees only; but if he installs playground equipment and posts a sign saying that the lot is open free to all children, there is then a public invitation, and those who enter in response to it are invitees.

"Where land is held open to the public, it is immaterial that the visitor does not pay for his admission, or that the possessor's purpose in so opening the land is not a business purpose, and the visitor's presence is in no way related to business dealings with the possessor, or to any possibility of benefit or advantage, present or prospective, pecuniary or otherwise, to the possessor." This court has recognized the "public invitee" category, as set out in the Restatement, in the case of *Hilker v. N. P. Dodge Building Co.*, 184 Neb. 495, 168 N.W.2d 701 (1969), but held in that case that it was unnecessary to determine that question, as a basis for liability was not established either as a "public invitee" or a "licensee."

"Where not only the facts constituting the conduct of the parties, but also the standard of care which they should have exercised, are to be determined, the case is entirely one of fact, to be decided by the jury." 57 Am. Jur. 2d *Negligence* § 7 at 342 (1971). A review of

the evidence in this case, as contained in the record, clearly reveals that there are fact questions requiring determination by the jury, not only as to negligence on the part of the defendant but also whether or not the plaintiff was guilty of contributory negligence, and also whether he had assumed the risk involved by participating in the basketball game on the day in question. Also, I believe the question is presented as to the legal status of the plaintiff on defendant's premises at that time. While the majority opinion purports to set out the facts in this case, I believe that such facts are not complete, and in many respects the evidence on the issues was conflicting and should have been decided by the jury rather than the court. I shall now review the record in this case, and the testimony of the witnesses, and point out certain additional facts and testimony which should be considered.

I shall commence with the testimony of the witness Danny Lohmeier, who was the executive director of the Miller Park Branch, YMCA. He was employed by the defendant from March 1975 to July 1979 and was serving in that capacity on the date of the accident, March 27, 1977. He testified with reference to the basketball court in back of the Miller Park Branch, YMCA, as follows: "Q. . . . Now, is that recreational facility, is that a community center? A. I believe that was the title at one time, yes. Q. And therefore it is accessible to the community; right? A. We tolerated people from the community using that facility. Q. No, but that wasn't my question. My question was, was it accessible to the community? A. The gate was unlocked; yes, sir. Q. At all times? A. To the best of my memory, yes. Q. Mr. Lohmeier, can you recall answering some Interrogatories propounded by myself, answering them on behalf of the Defendant corporation here; do you remember? A. Yes, sir. Q. Can you recall whether there was a padlock on the front gate of the playground surface? A. Yes, there is a padlock there. Q. Was it generally left open? A. Yes. Q. In fact,

was it ever locked? A. Not to my knowledge. Q. Could anybody that wanted to use the court come in and use it? A. Yes, sir. . . . Q. . . . Mr. Lohmeier, can you recall in your Answers to Interrogatories answering a question as to whether or not requests had been made for blacktopping the Y.M.C.A. back there? A. Yes, sir, I do. Q. Can you recall what your answer was to the question whether there had been any requests made? A. I believe my answer was no, there had not been. Q. Other than the initial request? A. Yes, sir. Q. So do you have personal knowledge whether or not any request for repair was made? A. I have no personal knowledge of any request for repair being made. Q. Mr. Lohmeier, did you ever go outside the building and back there on the playground itself? A. While I was an employee of the Miller Park Y? Q. Yes. A. Yes, I did. Q. What was your primary purpose for going back there on those occasions? A. General maintenance. Q. What did that entail? A. Primarily looking for a weed and trash problem, and general cleaning up those specific types activities. Q. While you were looking over the weeds did you have occasion to walk around the playground? A. Yes, sir, I did. Q. How often did you do that in the summer months? A. It would vary. There was no set schedule. I would have to answer approximately every two to three weeks. Q. Mr. Lohmeier, while you were going around looking did you have occasion to know or to look at the surface itself? A. I didn't specifically look at the surface, but, yes, I probably observed the surface. Q. Did you see any evidence of wear and tear on the surface? A. I don't know how to — yes, I suppose. Q. Did you see some evidence of wear and tear on the surface, is my question? A. Yes. Q. Did you see cracks on the asphalt surface? A. Yes, sir, I did, but they — Q. That is all I have asked you. I am handing you what has been labeled and marked as Plaintiff's Exhibit No. 1. I ask that you identify that, if you can. A. It is an impression in asphalt. Q. Did that exist on the playground surface

while you were employed? A. Depending on the time frame, to answer your question, yes. Q. So you did know it was there? A. During my employment, yes. Q. During your period of employment, Mr. Lohmeier, did the Y.M.C.A. put up any signs telling the public to keep out, that you can remember? A. During my employment, yes. Q. Was that before or after the accident occurred? A. It was after. Q. What did that sign say? A. I don't remember the exact wording. To paraphrase it, it said something to the effect 'For Y.M.C.A. members only.' Q. Before that time it had been open to the community; right? A. Yes, sir. Q. Before the filing of this lawsuit? A. Yes, sir. Q. These cracks that you mentioned before you talked about the depression, these cracks that you mentioned, what did they look like? A. My best memory of them is that they were just open cracks in the surface that had weeds sticking out of them that I wanted to get rid of. Q. Can you remember being asked that question on the 6th day of February, 1980, being asked what did they look like, and answering, 'Typical sidewalk cracks that you would see in any type of surface that had weeds growing out of them pretty much'? A. Yes, sir, that is accurate. Q. Was there anything unusual about those cracks? A. Not to my knowledge. Q. And the condition depicted in that picture [exhibit 1], that is not the cracks; right. A. No, sir, that is not."

The foregoing testimony of the executive director of the YMCA is clearly susceptible to the interpretation that the public was tolerated and even invited to use the basketball court in question, and also that the executive director knew of the defective and deteriorating condition of the surface of the court itself. It was for the jury to determine the permissible inferences from such testimony, and the testimony was not such that only one reasonable inference could have been deduced from the evidence.

Plaintiff also called as his witness, Michael Parks, president of James J. Parks Asphalt, an asphalt

contractor. He was asked a hypothetical question with regard to the installation of the asphalt surface of the court in question, based upon previous testimony that 397 tons of asphalt were applied to the surface 90 feet by 100 feet, to which a 3-inch lift was applied, and assuming that the playground surface was laid in 1971, and, also, other facts revealed by previous testimony. He was also shown exhibit 1, which was a picture of the surface of the playground taken shortly after the accident in question. He testified the cracks would probably occur in such a surface within a year or two after it was laid but had no opinion as to when depressions might occur in an asphalt surface. He also explained the difference between a crack and a depression, stating: "Well, a crack would be a severing of the pavement, and it would be like a chasm, which would vary in width; whereas a depression would be a subgrade failure in most cases and it would be a lowering of the slope of the asphalt, or the profile." He expressed the opinion that the depression in question was approximately ½ to 1 inch. He was asked his opinion as to whether the playground in question was a dangerous condition, and replied that, in his opinion, it would be dangerous to use as a playground. He was also asked with regard to the condition revealed by exhibit 1 (the picture): "Q. Do you have an opinion based upon that exhibit that you have before you as to whether or not there has been any maintenance applied to that condition? A. No, none." Without commenting or expressing an opinion as to the weight to be given to the testimony of Mr. Parks, it is clear that there is evidence in the record which should have been considered by the jury as to the ʻdangerous condition of the playground, and also as to the lack of maintenance thereof. This testimony created a permissible inference of neglect, which should have been presented to the jury.

I now review the evidence of the plaintiff McCurry as given at the trial. He did testify that he did not

know what it was that he fell on, but this statement should not be held conclusive with regard to the submission of the evidence to the jury, as the fact in question could be established by circumstantial evidence and the evidence of other witnesses. He also testified that although he was aware of cracks in the surface from previous occasions playing on the court, he did not know there was a depression at the time he was driving toward the basket until it was too late and he ended up lying flat on his face on the depression. Plaintiff was also permitted by the court to express his opinion on the question, and he replied: "Well, I fell into a sunken-in area, it looked to me like, my personal opinion." He was also questioned with regard to the hairline cracks in the surface, and was asked: "Q. Mr. McCurry, on that day, seeing those cracks, did that alarm you and prevent you from playing? A. No. Q. Why? A. I was concerned, but I didn't think it would hinder my playing; in other words, to hurt myself. I am not a masochist." He testified that the depression he was injured on was different from the hairline cracks and that the cracks "were hairline, spread like cancer, and the depression was a sunken-in type of deal." He was shown the picture of the surface taken after his accident and identified exhibit 1 as "the depression where I hurt myself." On cross-examination he again stated that although he had seen the hairline cracks, he had not seen the depression until after he fell. He testified that he was not looking at his feet when he drove to the basketball hoop at the time he fell down. On redirect examination he was asked: "It was the cracks that were long; is that correct? A. The cracks were long; yes. Q. But the cracks were not the depression; right? A. That's correct. Q. It was the depression you got injured on; correct? A. Yes." The foregoing testimony clearly reveals that there was, to say the least, a fact question presented as to what he fell upon and what caused his injury.

Plaintiff also called as a witness one William John

Pilcher, who was one of the participants in the basketball game on the day in question. He testified that he had seen the cracks in question in the surface of the court, but, prior to the plaintiff falling down, he had not noticed any sunken-in areas on the asphalt surface. However, he did after the accident. He stated that he had not seen the sunken-in area before McCurry fell because "I was too busy running around shooting." He was asked: "After the accident occurred, what did you notice, if anything, about the point where Mr. McCurry's left leg had hit the asphalt surface? A. There was a like a little sunken-in area." He was permitted by the court to express his opinion as to the reason for McCurry's falling, and stated: "My opinion was that when he cut for the basket, his foot hit the sunken area and he fell." Since this testimony was in the record, it was entitled to be considered by the jury for its determination as to the weight to be given to the testimony. It is also clear to the writer of this dissent that the question of McCurry's contributory negligence, and also whether under the facts in the record he had assumed the risk, should also have been submitted to the jury. We have held that a duty to warn may arise even though a defect or condition is in fact open and obvious where the circumstances are such that there is reason to believe that the risk of harm involved would not be anticipated or appreciated. *Jensen v. Hawkins Constr. Co.*, 193 Neb. 220, 226 N.W.2d 346 (1975). We have also held that holes, ruts, or depressions in a street or sidewalk may give rise to a right of action for injuries caused thereby if they are of such a nature that danger therefrom might reasonably be anticipated; but that slight holes or depressions which are not in the nature of traps, and from which danger could not reasonably be anticipated, are not defects for which an action will lie. *Christensen v. City of Tekamah*, 201 Neb. 344, 268 N.W.2d 93 (1978). Whether the depression in question was of such magnitude as to constitute a trap would seem clearly

to be a fact question for determination of the jury under the evidence in the record; and the dimensions of the crack or depression in question, whichever it was, were the subject of various estimates by the witnesses who testified. We have also held that a person lawfully on the premises of another assumes dangers which are open and obvious and which can be seen readily and avoided by the exercise of ordinary care. The questions of whether the depression was open and obvious and whether the plaintiff had seen the depression and had assumed the risk were also clearly for the determination of the jury. See *Hilker v. N. P. Dodge Building Co.*, 184 Neb. 495, 168 N.W.2d 701 (1969).

We believe that reasonable minds might well differ on all of the issues we have discussed above, and we have set out in this dissenting opinion evidence which we believe not only justifies but requires the submission of the case to the jury. We are convinced that the trial court erred in directing a verdict for the defendant under the rules set forth at the outset of this dissenting opinion, and that this case should be reversed and remanded for a new trial.

KRIVOSHA, C.J., and WHITE, J., join in this dissent.